Here ye, here ye, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson. Please be seated. I'm sorry for the delay at this point. We were discussing and then we had technical problems. Your Honors, the second case on the docket this morning is 2-23-0183. In the name of the State of Stephen E. Anderson, William E. Anderson, Jr., Petitioner of Hunt, the appreciated current appellant, Mr. Bob Appellate. Arguing on behalf of the appellant, Ms. Catherine Sloan. Arguing on behalf of the appellee, Mr. John W. Platt. Ms. Sloan, if you are ready, you may proceed. May it please the Court. Good morning, Your Honors. Catherine Penrose Sloan on behalf of the Estate of Stephen P. Anderson. Your Honors, we ask this Court to recognize today that Mr. Anderson and his ex-wife, Ms. Curnow, clearly and unambiguously expressed their intent to forever sever all joint ownership of all marital property when they entered into a marital settlement agreement 12 years prior to Mr. Anderson's death. And no amount of friendly relationship in the 12 years after that marital settlement agreement could undo what they had agreed to previously, nor could it create a new joint tenancy in that account. Now, the burden is on you, correct? Yes, Your Honor. There was some testimony, I think it was from her, Patty's sister, saying that he wanted to leave something to Patty. That's true, Your Honor. And the Court, it found in its findings, I read, that it found, quote-unquote, all witnesses were candid and truthful. That's true, Your Honor. So what is the standard of review for us? Your Honor, in this case, the standard of review is de novo because you are interpreting a marital settlement agreement. And the question is whether, as a matter of law, the parties intended to forever sever joint tenancy. And this Court recognized that in the Estate of Donkey case, which was also decided as a matter of law, that the parties had agreed to sever and thereby end the joint tenancy. It is that intent. Illinois law is settled that joint tenants can agree to hold as tenants in common and thereby sever the joint tenancy. A divorce decree necessarily does not sever. That's true, Your Honor. Exactly. It's the key question that this Court looks to is the intent of the parties. And there are two ways to glean that intent. One is by looking at the plain language of the agreement. And the other is to look to see if there is any conduct inconsistent with holding that account in joint tenancy. The post-dissolution conduct. I'm sorry, Your Honor? The post-dissolution conduct. Yes, Your Honor. Yes. And in this case, we have both ways to show that the parties so intended. Looking to that plain language of the agreement itself, there is no clearer expression of the parties' intent than the language that they used after consulting with counsel and negotiating the agreement and a seven-page agreement and initialing each page and signing it and then presenting it to the Court to be included as part of a divorce decree. And in that agreement, the parties stated that it was their intent to split the account. And by splitting, that is, as the Appellate Court recognized in Brock, splitting means dividing it as tenants in common into two equal shares. They, therefore, agreed to hold as tenants in common. That severed the joint tenancy in this bank account. And, therefore, the account should have been, I mean, sorry, the account at that point was split into two tenant in common shares. And then the language continues on to show that Ms. Curnow was paid for her tenant in common share. And the account then belonged to Mr. Anderson. Answer this question for me because I'm a little bit confused and the documents are a little confusing. But was her name taken off of it? Because when the statements came, his name was on it. But on the outside, like where it folds, where it comes through the address part, it had both of their names. That's true, Your Honor. But the same is true with the bank statements in the Donkey case. And this Court in that case recognized that that matter alone was not sufficient to undo the clearly expressed intent from the marital settlement agreement. It doesn't undo that intent, and that's for good reason. Because the only way that Mr. Anderson could have corrected the fact that her name was still on the bank statements was to change the title of the bank statements. Did both of their names appear on the checking account? Do you mean on the actual checks? Yes. Until a point that appears to be it's a reasonable inference that when he ran out of the checks that had both names, then the checks after that only had his name on them. So the checks subsequently had only one name. Yes, Your Honor. Okay. Yes. And, you know, the trial courts here erred by focusing so heavily on those bank statements, not only because this Court rejected that argument in Donkey, but also because, in essence, the Court was requiring Mr. Anderson, in order to remove her name from the account, quote, unquote, the only way to do that was to actually change the title. The bank would only do that if you closed the account and opened a new one, an individual account. So the circuit court, in essence, said that in order to sever the joint tenancy as a matter of law, the parties here would have had to sever the joint tenancy and change title as a matter of fact. So it was the intent in Donkey that showed that it was separate. Yes, Your Honor. Not only in Donkey, but in Remarriage of Dowdy, in Woodshanks Estate, a matter of the State of Cullman. There's a whole line of cases showing that that intent is the key. And here we have not only the plain language of the agreement, which incidentally says that it was to sever the parties' joint ownership of all marital property, and this Court should reject Ms. Curnow's tortured reading of the word all, which is apparently everything except the bank-accounted issue here. Is this the only bank account that Mr. Steven Anderson had? Yes, Your Honor. So he didn't have a savings account. No, Your Honor. He might have had some retirement issues, but nothing of a bank-account nature. Exactly, Your Honor. And that leads me to the second point, because looking at the party's conduct post-dissolution decree, that conduct was inconsistent with holding in joint tenancy for one of the reasons being that Mr. Anderson used it as his sole bank account. By contrast, for 12 years, Ms. Curnow never deposited to the account, never withdrew from it, never wrote checks, never used a debit card, didn't receive the bank statements, didn't pay an interest on taxes, didn't inform the bank that she had changed her name or address. And, in fact, she wasn't aware that the bank still had her name on any of the account at all until I called her once Mr. Anderson was deceased and the administrator was attempting to gain access to the account. By contrast, Mr. Anderson was his sole bank account. All of his deposits, his paychecks were direct deposited. Those were withdrawn. They were direct debits. He wrote checks. He used a debit card. All the bank statements were sent to his address. And looking also at the way the parties handled the tax return, the parties had agreed as part of the dissolution proceeding to split the tax refund that they were expecting to receive shortly after the dissolution. And the way the parties handled that was inconsistent with maintaining joint tenancy in that account. That tax refund went into the account, and then Mr. Anderson, almost immediately, sent half of it, transferred it to Ms. Kernow. That shows that they had agreed to end the joint tenancy of the account because he had to transfer it to her in order for her to have access to it. All of that conduct is inconsistent with holding the property as joint tenants. Rather than looking to the intent of the parties, which should have been the key issue, the circuit court in this case erred by accepting or looking to the parties' post-divorce, cordial, friendly relationship that they maintained. And as lovely as it is that they were able to maintain such a relationship after their divorce, that does not undo the intent that was clearly set forth in the executed marital settlement agreement. The same issue was presented to this court in the Donkey case. This court rejected it, saying that no level of affection between the parties was going to undo what had been done via the marital settlement agreement, and that the only way that that conduct is relevant is if it was sufficient somehow to show that the parties had created a new joint tenancy in the account. And just as this court rejected that argument looking at similar conduct in Donkey, it should reject it here, saying that this court said in Donkey, we've already found in the language of the dissolution decree and its incorporated settlement agreement clear and convincing evidence that the Donkeys intended to sever their joint tenancy. And at that point, the decedent's ex-spouse, quote, would have had to prove creation of a new joint tenancy in the accounts after the issuance of the decree. This she did not do. There's no support at all in Illinois law for the proposition that some generalized goodwill, kindness, generosity between two parties is sufficient to create a new joint bank account. Instead, the appropriate conduct to look at is the conduct related to the account itself. And when looking at that, there is absolutely no evidence in the record that the parties ever discussed or did anything, affirmatively did anything to reestablish a new joint tenancy in the bank account. And the other issue is this sister saying that he had said, I want to leave patents and hand her girls some money. It would have had to be by way of a gift, and I don't this is his, it's his money. I don't see any donor intent to give this gift, and there would have to be at least, as I understand gift law, some receipt by the person, you know, who's getting the gift, and that did not occur in his lifetime, correct? That's correct, Your Honor, and that donative intent was an incorrect analysis in this case for three reasons. First, as I've already mentioned, it doesn't undo the intent that they've already established, and that should be the end of the question. But it's also inappropriate because this donative intent was not directed toward the account at issue at all. There was no mention of any nothing even to that level. And these generalized comments of I'd like to take care of you, I want to leave you money are lovely things to say, but that in and of itself is not enough, even if it is an intent to donate something, it's not enough to create a new joint tenancy in this account. Your Honor, the line to be drawn here with respect to when a divorce decree sufficiently shows the party's intent to sever can be shown if one compares the cases of Sondland v. Bernstein and Inouye marriage of Dowdy. And in both cases, there was a marital settlement agreement in which the parties did not actually say, much unlike here, did not actually say that they intended to split the property at issue. In fact, in the Sondland case, the marital settlement agreement expressly stated that they didn't intend to sever that joint tenancy. In the marital settlement agreement was that the parties would split the proceeds in the event that the house was sold. Well, the court also then looked to, in the marriage of Dowdy case, this court looked to the dissolution proceeding testimony to help glean the intent of the parties. And similarly, in this case, as the court looks to, in addition to the plain language, the dissolution proceedings itself, Ms. Curnow testified that she received payment, $25,000, for her share of all marital property. And that necessarily includes the bank account at issue here. And that came out of that bank account, correct? Yes, Your Honor. Leaving a rather $2,000 balance. Exactly, Your Honor. In some change. Exactly, Your Honor. And when Ms. Donkey, I'm sorry, Ms. Donkey, when Ms. Curnow received that tax refund transfer from Mr. Anderson, there's no evidence in the record that she said anything like, hey, where's my extra $1,000 that's half of the balance of the account. There's no evidence that she ever asked for that or ever said anything to Mr. Anderson. And so if she was asking for it, she would need to have it, and she would have to have it in a way that would be appropriate and compensated. I have no questions. Any further questions? You'll have an opportunity to respond after, Mr. Quinn, if you choose to do so. Thank you, Your Honor. Good morning. If it pleases the Court, I'm here this morning on behalf of the appellee Patty Kernow, and I wanted to start out by saying that I believe the appropriate standard of review in this case is an abuse of discretion standard. I was going to ask you that, Mr. Quinn. You don't agree that it's deniable because we're citing the Pelton case, and in that case they said to the extent that the trial court applied the terms of the contract to the facts, our review is based on an abuse of discretion standard. Okay. Now, he died 12 years after the divorce. He did, yes. Okay, so during that 12-year period, did other than the settlement agreement and the taxes, did she ever get money from that account? She did not. And did she ever place money in that account during that period? She did not. In fact, his money or his paychecks were directly deposited into that account. You know, I'm not 100 percent sure, but that is probably the case. In that 12-year period, did she ever sign any checks in that account? She did not. So she doesn't see him for six months prior to his death, correct? That's correct. Somebody said that there's some evidence in the record that they may have texted. They texted. He had been ill and there were some difficulties at the time of his death, yes. They had remained close. In fact, seeing each other basically weekly, they traveled together. They were constant companions after the divorce. And I asked a question to the appellant about these bank statements and how they came with his name up top, but both of their names on the return address. I believe that the statement said both their names on it. Do you think so? Yes. But her name eventually was dropped off of the checks. That's correct. When you ordered new checks, her name was not on the new checks. And her name even was changed from Anderson to Christine. She took her maiden name after the divorce, yes. And so the account said Anderson, correct? The account said Steven and Patty Anderson, correct. Okay. So even with all of that physical evidence that we can hold in our hand, we can also hold the agreement, marital settlement agreement that is incorporated into the divorce judgment. That's the most important part. How exactly can we overlook the language in that marital settlement agreement? Well, I don't want you to overlook the language in the marital settlement agreement. The marital settlement agreement has two provisions that are relevant in this case. Paragraph 1, Article 3 of the Anderson's marital settlement agreement provides that the parties have agreed to split or have split the joint checking, savings, accounts, and personal property. Then Paragraph 2 of Article 3 provides that the parties own a marital residence located at 349 South Old Rand Road, Lake Zurich, Illinois. Steven has refinanced the residence and has paid Patty the sum of $2,500 as and for her interest in all marital property. So these are two separate provisions. And under the DiBonetti case that I cited, those paragraphs have to be harmonized. Based on Paragraph 1, the parties were required to split their bank accounts and personal property. And based on Paragraph 2, Patty was to get the $25,000. While she got the $25,000, they never split the bank account. Had they already split the bank account, then the marital settlement agreement would have read the parties have already split the joint checking, savings, accounts, and personal property, but they hadn't. How much was in it? A couple thousand dollars. $2,000. How about the part of the marital settlement agreement that says the parties here to consider it their best interest to and fully settle rights of property for the parties, other rights going out of the marital or any other relationship now or previously existing between them, and to settle any and all rights of every kind, nature, and description, whether either of them now has or may hereafter have or claim against the other, et cetera, et cetera. Doesn't that kind of put a finality on this relationship? It doesn't here, and I think the reason is because for whatever reason, the courts in Illinois have not decided that the fact of a divorce alone splits the joint tenancy or severs the joint tenancy. The law in Illinois is clear that the joint tenancy remains in place after the judgment of dissolution of marriage. If it's just the judgment of dissolution, correct? Correct. If you attach, incorporate, however you wish to call it, this settlement agreement that Justice Shostak just read a conclusion paragraph from, essentially, then that's what we have to abide by, correct? Yes, you have to abide by the marital settlement agreement. That's correct. But the point is that in this marital settlement agreement, there was something left open to do at the end of, after the judgment was entered. And, for example, in the Donkey case, the marital settlement agreement said in capital letters, husband shall have as his sole property, then paragraph three, stocks and bonds in his possession valued at 18,600. So in that case, there was specific language that divided the account. It didn't say something had to be done in the future. In this case, something had to be done in the future. But he only, in this case, there was a house and there was this account. With about $2,000, right? Well, $2,000 was left after he made the $25,000 payment. Okay? Correct? That's correct. All right. And even if, even if we took your position here that $2,200, if it still had to be split, is a whole lot less than the approximate $52,000 that was in that account at or around, no, 58,000, at or around the date of death? That's correct, Judge. And the reason that Ms. Kernow would be entitled to all of the money in that account is really set forth in the estate of Blom case that counsel referred to with the statutory requirements, a presumption arises that the person who furnishes the funds for the account intends to make a gift to the other person who is designated owner of the funds. The presumption is rebuttable, but the party challenging it has the burden of proving by clear and convincing evidence that no gift was intended. So we have these cases all the time where money is put into a joint account. Somebody doesn't contribute anything to it, but the presumption in Illinois is that anything that the person deposits into the account is a gift to the other party. Well, you make a good point. They're tenants in common, correct? Well, they're joint tenants. The account is a joint account. Does the divorce itself create joint, I mean, a tenants in common? And the agreement, the marital settlement agreement talks about something else. Well, my position would be that the marital settlement agreement didn't sever the joint tenancy. But assuming hypothetically that it severed the joint tenancy and they were tenants in common, then she'd only be entitled to half. She would be entitled to half of the money that remains in the account. That's correct. And you disagree with the Domke case in how this loan relies upon it? Well, the Domke case, yes, I disagree with the way she relies upon it, because in the Domke case, we had the situation where we had the brokerage account, and the brokerage account was specific, there was only one brokerage account, and it was specifically stated in that marital settlement agreement that that would be his sole property. We don't have that here. Maybe without looking at the whole Domke record, maybe there was enough property to set aside or to say this is his, whereas in this case, we really only have two assets and maybe a retirement account that he alleged, maybe a retirement account, I'm not sure about that. We have a bank account, the only one they had, and we have a house. That's true. We did have a retirement account, and I'm glad that you brought that up, because I think that's important in this context, because Stephen knew that in order to take Patty off his retirement account, he had to go there and change it, which is what he did, and there was unroboted testimony that he did it. Put his brother's name on it. Put his brother's name on it. And what that leads me, and what I think the trier of fact could say, is that well, he knew to take his wife off, his ex-wife off the retirement account. He certainly knew if he didn't want her to have a survivor's interest in this account, that he could have gone to the bank and That's correct. She continued to appear on the statements always. But dealing with the company you're working for and knowing their policy is understandable. Dealing with your bank and knowing that you have a decree that separates or splits your accounts, your property, may not trigger with someone that they should go to the bank and do something. That's certainly one very valid interpretation of what could have occurred. But in this case, the other inference is that he knew full well what he needed to do, and he chose not to for a reason. And in this particular case, I think the trier of fact would be in a position to make a testimony about the nature of the relationship between my client and her ex-husband. And it wasn't a normal bitter divorce situation. It's a situation where Mr. Anderson had drinking problems and they couldn't remain together. But they did, they couldn't live together anymore. But essentially they continued to be close and together every day. And I think another important piece of testimony is that maybe a year or two years before he died, he went out into the garage. He was a smoker, as was Ms. Kernow's sister. So smokers are now sent out to somewhere to cower in smoke and privacy. And while they were doing this in the garage, they had this conversation where he said that he still loved Patty and that he intended to take care of her and her daughters. This is testimony that the trial court heard. From the sister, though. They were back from the sister. From the sister, yes. And I think this is testimony that the trial court could hear and say, this man knew that he had a joint account. And he knew that he did. They were married for 12 years. They got married in 1998 and they were divorced in 2010. And then he passed away, I believe it was 2022 in Abram and Friends. All of those years. And just, you've said, you know, this is not your classic acrimonious divorce, sitting in this seat and sitting in the seat I sat in before, some are, some aren't. But they tend to get a better relationship, at least I've learned, after they get divorced because they don't have to live together anymore. And this could be what happened here. And yes, he could have had feelings for her. But do those feelings translate as a matter of law to are not following a document, a marital settlement agreement, a contract between the parties? I'm not asking you not to follow the settlement agreement. What I'm arguing is that the settlement agreement left something to be done which wasn't done. In most of these cases. So it should have divided that 2,200. Yes, that account should have been divided. In most of the cases we see, the Blom case, there's evidence taken as to what happened after the divorce. Or after the account was set up. That's how you figure out in these cases whether it was a convenience account. You can finish your thought. Whether it was a convenient account or whether it was meant to be a gift. Thank you, and I ask you to inform the trial court. Thank you, Mr. Quinn. All right, Ms. Lone, if you wish to respond, you may do so at this time. I'd like to hear your response to Mr. Quinn's argument that that checking account was not, in fact, divided at the time of the divorce. Yes, Your Honor, may it please the court. That was one of my points on rebuttal, actually, Your Honor. It is simply untrue that if an agreement leaves something open, I believe was the language he used, that that is insufficient to sever a joint tenancy. Because if that was true, from this court's decisions in in-ray marriage of Dowdy, where things were contemplated to happen in the future but were not done at the time of the divorce, and in matter of Coleman's estate, same situation, and there are others as well. The question isn't whether or not it was done. The question is what do the parties intend to do? So even if the parties had not divided the account at the time of the divorce, that would be irrelevant to the determination as to whether or not the joint tenancy was severed. However, there is ample evidence that the parties did intend, and this is the only factual issue that was before the Circuit Court. There is ample evidence that the parties did intend to sever, not only, I'm sorry, that the parties did sever, not only from the language of the marital settlement agreement pertaining to the division, the payment of the $25,000 for quote, all marital property, that's an E-10 in the record, but also E-20 in the record, the testimony of Ms. Cornell herself at the dissolution proceedings, that she had received $25,000 as payment for all marital property. So, you know, and the way the parties handled the tax refund similarly shows reasonable inference that she had already been, received her share of the $25,000. Ms. Cornell doesn't even address that issue of intent at all. And instead relies on the state of Blanc case, which is not a divorce case, no MSA at issue, not, in fact, severance of joint tenancy wasn't an issue in that case at all. That case is one of the many cases that deals with so-called convenience accounts, which look back to the time of the creation to determine whether or not there was sufficient donative intent to truly create a true joint tenancy, completely irrelevant here. No one's contesting. This account at the time of its creation was indeed a joint tenancy. We're not claiming it's a convenience account. The question is, what happened after that? And in this case, that marital settlement agreement clearly expresses the intent to sever the joint tenancy, distinguishing that the Damke case are belied by the language itself of Damke. Counsel makes much of the fact that the language between the two agreements is different and somehow because Damke specifically awarded some property to one party versus the other, that that made a difference. But this court actually said, no, it doesn't, in the Damke case itself, where this court said, we find that the parties expressly agreed to even more than the mere severance of the joint tenancy in the securities. The parties agreed to vest sole ownership in one party. So it isn't the floor that that's what's required in order to sever joint tenancy. It's just a matter that in that case, unlike this case, that the parties, the way the parties agreed to split was to sever the joint tenancy rather than saying we're going to split the sole bank account. Counsel's, in essence, ruling in Ms. Curnow's favor would require this court to overrule Damke and in re marriage of Dowdy and also Kurtz v. Solomon with respect to the standard of review because the standard of review for anything had been severed as a matter of law is de novo as was indicated in both Damke and Kurtz v. Solomon. The only factual question, the only thing the trial court relied on testimony for, or should have relied on testimony for, the only relevant issue that testimony was relevant to was whether or not this account was actually split. And it's true that at the citation proceeding, Ms. Curnow testified that it hadn't been. She also admitted that she had testified inconsistently with that at the actual time of the divorce during the dissolution proceeding. So, you know, her testimony was effectively impeached. And if Your Honor said no further questions. And I have no further questions either, even if I could ask. So we would stand on our briefs for the remaining arguments and ask this court to reverse. Thank you, Your Honor. Thank you. And at this time we will take the matter under advisement. We will stand in recess to prepare for our next case. And we do thank the parties this